Moss, Judge,
delivered the opinion of the court:
On July 20, 1917, plaintiff, the Remington Arms Union Metallic Cartridge Company, entered into a contract with *555 the Government by tbe terms of which it was agreed that plaintiff would manufacture for the use of the Government 470,000,000 ball cartridges in accordance with certain drawings and specifications, for which plaintiff was to be paid the actual cost of manufacture, including facilities, materials, and labor; and for its profit plaintiff was to be paid an amount equal to ten per cent on the actual cost. It was also provided by Article XI, paragraph (d), subparagraph (3), that the Government would pay “ a reasonable rate of interest not exceeding six per cent (6%) per annum on a proper proportion of the investment in plant, facilities, inventory, and working capital, not owned or provided by the Government.” Thereupon plaintiff entered upon the performance of the contract, purchasing its materials in the market and at the market price, and charging the Government the actual cost of same, together with interest at the rate of 6 per cent per annum on items of investment under the provisions of the contract just mentioned, plus ten per cent as profit, as provided in the contract, which charges were, from time to time, paid by the Government. A number of supplemental contracts were made merely providing for additional supplies of cartridges under the same terms and conditions as contained in the original contract.
In September, 1914, an agreement was entered into between plaintiff and the American Brass Company by which the brass company undertook to furnish, and the plaintiff agreed to accept, for a period of five years, plaintiff’s entire requirement of a certain metals composition necessary in the manufacture of cartridges, generally referred to as conversion supplies, at the price of two and one-half cents per pound on brass and gilding-metal conversion, and eleven and three-eighths cents per pound on what is called cupro-nickel conversion, and one and three-fourths cents per pound for scrap reconversion. Thereafter the American Brass Company furnished plaintiff its conversion supply, as will be hereinafter fully explained.
Defendant states that in September, 1918, it received certain information concerning plaintiff’s contract with the American Brass Company. In a conference thereafter, to *556 wit, on December 18, 1918, between representatives of plaintiff and representatives of the Government, plaintiff disclosed all agreements between plaintiff and the brass company covering conversion requirement of plaintiff for the period of performance of the cartridge contract. Thereafter a full audit was made by an auditor selected by defendant, with the permission and assistance of plaintiff, which resulted in a finding by the auditor of an alleged overcharge by plaintiff on account of conversion prices amounting to $646,828.59. In January, 1919, defendant withheld the sum of $400,000 from sums otherwise due plaintiff under the contract pending the investigation just mentioned. On July 16, 1919, defendant withheld from sums otherwise due plaintiff the further sum of $246,828.59, which together with the $400,000 theretofore withheld, constituted the aggregate sum of $646,828.59 found by the auditor to be an overcharge. This action is for the recovery of the sum so withheld, $646,828.59.
The theory upon which defendant assumed the right to withhold this sum from plaintiff is based upon the contention that the Government was entitled under its contract with plaintiff to the benefit of the price for conversion supplies obtaining under the brass contract of 1914. A proper determination of this issue requires a consideration of both contracts. For many years prior to 1914 plaintiff company had been procuring most of its conversion supplies from the American Brass Company. Plaintiff, however, had never in any single year prior to 1914 required for its' use in the manufacture of cartridges more than 9,200,000 pounds of brass and gilding-metal conversion, nor more than 76,000 pounds of cupro-nickel conversion, and this was at that time approximately the capacity of plaintiff’s cartridge-making plant. Both the capacity of the plant and plaintiff’s requirement of conversion supplies were then and theretofore well known to the American Brass Company. Anticipating an increased demand for the products of its plant by reason of the European war, which began on August 1, 1914, plaintiff, exercising unusual business caution, sought by its ar *557 rangement with the brass company to protect itself in the matter of supplies necessary in the production of cartridges and against probable increase in the price of such supplies. Plaintiff’s requirement, by reason of the abnormal growth of its business, increased to such extent that the brass company objected to furnishing plaintiff’s entire requirement, claiming that the large increase was beyond its obligation under the agreement of September, 1914. An adjustment was made in July, 1915, by which it was agreed that the words “ entire requirement ” should be held to entitle plaintiff to have 17,100,000 pounds of brass and gilding-metal conversion and 900,000 pounds of cupro-nickel conversion at the low price for the years 1915 and 1916; and it was further agreed that for any excess that might be needed by plaintiff the price during each of these two years should be three cents per pound for brass and gilding-metal conversion and fourteen cents per pound for cupro-nickel conversion until the total quantities claimed should equal 50,000,000 pounds. This arrangement was observed throughout the years 1915 and 1916. The brass company, however, refused to renew the three-cent excess conversion rate for the year 1917, and the parties agreed on a six-cent price on this item. It should be mentioned that plaintiff reached the low price limit of 17,100,000 pounds for the year 1917 by April of that year, and thereafter during the year it paid the price of six cents per pound for such excess for its use in its commercial business and its fixed-price contract uses. It likewise reached its low price limit of 900,000 pounds of cupro-nickel conversion by May, 1917, and. thereafter paid during the remainder of the year fourteen cents per pound for the excess cupro-nickel conversion required and used by it in its commercial business and its fixed contract uses.
It also appears that, owing to a fear that its supply of service for its commercial uses might be imperiled, plaintiff contracted with another mill for not less than 7,000,000 nor more than 10,000,000 pounds of brass and gilding-metal conversion at ten cents per pound. Under this contract it took at that price 4,880,888 pounds in 1917, and the balance of the *558 7,000,000 pounds in 1918. At the time, therefore, of the execution of the contract between plaintiff and the Government, July 20, 1917, plaintiff having already exhausted its low price limit for 1917, was then paying the brass company six cents per pound for such excess as it was procuring from said company, and was also paying ten cents per pound for 4,380,888 pounds secured in 1917 under the contract just above mentioned. In 1918 plaintiff was still receiving a less quantity of the low-price material than was sufficient to meet its commercial demands.
The whole question involved here is whether or not plaintiff under its contract with the Government was under obligation to devote to the Government contract the low-price material acquired under a previous contract, while at the. same time it was required to purchase such material as was necessary for the performance of its fixed-price contracts, and for its commercial business at prices ranging from six to ten cents per pound. Without reference to the terms of the Government contract, which will presently be considered, we are of the opinion that it was under no such obligation. If all the material contracted for in 1914 had actually been on hand in plaintiff’s plant on July 20, 1917, plaintiff could not have been compelled, in the absence of an express stipulation to that effect, to furnish same at the price provided in the 1914 contract, or at less than the prevailing market price. The same principle would apply to materials delivered from time to time under such contract. The construction of the contract contended for by the Government would amount to nothing more nor less than a confiscation by the Government to the extent of the difference between the low price obtaining under the brass company contract and the price paid by plaintiff from time to time for materials used in the Government contract, which appears to have been the fair market price.
It should be observed, however, that the respective rights of the parties are fixed by the plain terms of the contract itself. It is provided that “ the contractor will, from time to time, except as otherwise provided, purchase or contract for *559 the purchase of all materials * * * and upon such terms as appear to the contractor to be reasonable.” It is further provided that “the contractor shall use every endeavor to obtain materials * * * under this contract at the lowest possible prices, and shall in no case pay higher prices than required by existing market conditions, nor higher prices than are or would be paid for similar materials, purchased at the same time and under like circumstances and conditions for other work in progress in the plant.”
This language plainly relates to future purchases of supplies for use in the performance of the contract. It is not susceptible of any other interpretation. Any construction of these terms which would permit the Government to claim the benefit of a purchase of materials three years prior to the date of the Government contract would be a perversion of the ordinary meaning of language.
Some confusion has arisen concerning an item of $129,-365.12 which was paid to plaintiff on November 29, 1920. The Government contends that if plaintiff should be allowed a recovery of the $646,828.59, this amount paid on November 29, 1920, must be deducted. The Government paid plaintiff the $129,365.12, which is 20 per cent of the $646,828.59 withheld by the Government under Article XI (c) of the contract, which provided for a bonus of 20 per cent as a saving between the estimated “ normal cost ” and the actual cost. Plaintiff, thereafter, requested the Auditor for the War Department to settle its claim concerning the deduction by the Government of the $646,828.59, and on May 1, 1921, the auditor made a finding in plaintiff’s favor in the sum of '$511,462.81, which was the difference between the amount withheld by the Government and the bonus of $129,365.12 which had already been paid to plaintiff. On review of the ■finding of the auditor the Comptroller General reversed the decision of that official and held that the entire amount, $646,828.59, had been properly deducted and withheld from plaintiff, and charged the bonus of $129,365.12 against the account of the disbursing officer. After the execution of the -contract of July 20,1911, plaintiff and the Government made *560 other contracts, and on February 14,1922, a settlement agreement was entered into between plaintiff and the Government. The so-called “ brass conversion claim ” then pending before the Comptroller General for $517,462.87 (plaintiff at that time still retaining the bonus of $129,865.72) was specifically excepted from the general settlement. When the settlement award, which amounted to $650,000, was paid to plaintiff, the disbursing officer against whose account the Comptroller General had charged the $129,865.72 as an erroneous payment to plaintiff, deducted said sum from the $650,000 and plaintiff was paid the balance of $520,634.28. It is perfectly clear, therefore, that the $129,365.72 was taken from plaintiff by this deduction by the disbursing officer.
It should be noticed in connection with the bonus item that plaintiff itself is in error concerning same. In its brief it is stated “ in a general settlement of all claims and contracts between Remington and the Government (save the claim here in suit), which settlement was had in February, 1922, and while Remington still held the above 20 per cent, the Government insisted that Remington should deposit in escrow (which Remington did) one-half of that 20 per cent, plus other small items, totaling about $70,000. Such deposit was to abide the event of this brass conversion controversy, and it still remains on deposit in escrow.” Plaintiff wholly misconceives the facts in regard to the escrow deposit. It is plainly set forth in the settlement contract referred to in the following language: “It is further agreed that the contractor shall deposit in an interest-bearing escrow account the sum of sixty-one thousand one hundred thirty dollars forty-eight cents ($61,130.48), being the profit paid by the United States on the principal sum of the brass conversion claim, together with the sum of eleven thousand four hundred and sixty-one dollars ninety-six cents ($11,461.96), which is agreed to be the accrued interest thereon to the date of this contract.
“ It is further agreed that upon final decision by the Comptroller General, or courts of competent jurisdiction of the ‘ brass conversion claim,’ the contractor shall release to *561 the United States such proportion of the amount then on hand in the above escrow as the proportion of the ‘brass conversion claim ’ disallowed bears to the entire ‘ brass conversion claim,’ and the United States agrees to' release to the contractor such proportion of the amount so then on hand in the said escrow as the proportion of the ‘brass conversion claim ’ allowed bears to the entire ‘ brass conversion claim.’ ” The total sum, $72,592.44, was deposited on March 8, 1922, in an interest-bearing escrow account in the Third National Bank, Springfield, Massachusetts, where it now remains. (Finding XY.)
The petition in this case did not contain a prayer for interest. After submission and argument plaintiff presented for filing a motion for leave to amend the prayer of complaint so as to include a claim for interest. This motion is hereby granted, and the filing of an amended petition to that end and purpose is allowed. Plaintiff, however, is not entitled to interest as claimed. The service and materials furnished the Government by plaintiff were rendered and furnished under contract. The allowance of interest is therefore prohibited by section 177 of the Judicial Code, which provides that “No interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest.” The only stipulation for the payment of interest under this contract is contained in Article XI, as mentioned above (Finding II), and all interest called for under that provision was charged against the Government and was paid by the Government (Finding XYI).
In the opinion of the court plaintiff is entitled to recover herein the sum of $646,828.59, and it is so adjudged.
Hat, Judge; Booth, Judge; and Campbell, Ohief Justice, concur.
Geaham, Judge, took no part in the decision of this case.